**STATE v. SULLIVAN et al.**

**No. 8203.**

Court of Civil Appeals of Texas. Austin.
July 17, 1935.

On Motion for Rehearing Oct. 23, 1935.

Wm. McCraw, Atty. Gen., H. Grady Chandler, Asst. Atty. Gen., and Ralph W. Yarbrough, of Austin, for the State.

Ireland Graves and E. Cartledge, both of Austin, Vinson, Elkins, Sweeton & Weems, R. O. Kenley, and David T. Searls, all of Houston, for appellees.

BAUGH, Justice.

This suit was originally filed by E. B. Sullivan and W. W. Hawkins against J. E. Franks, the Humble Oil & Refining Company, and the state; the State being sued under permission granted by the Legislature, for the primary purpose of determining whether the 15.77 acres of land involved in the Conroe Oil Field in Montgomery county is vacant school land. J. E. Franks had filed upon it as such, had procured a mineral lease thereon from the Commissioner of the General Land Office, which lease he had assigned to the Humble. The Humble also had a lease thereon from Sullivan and Hawkins, who claimed the land as a part of the Theodore Slade survey. The original suit of Sullivan and Hawkins was in trespass to try title. The state filed a cross-action seeking to recover said land as vacant lands, subject to the mineral lease thereon made to Franks. Sullivan and Hawkins subsequently took a nonsuit. Franks by cross-action sought to recover title to the land and to cancel his assignment to the Humble of his lease thereon. The case was tried to the court without a

jury on such cross-actions, and judgment rendered against the state; hence this appeal by the state only.

The controlling and determinative issue in the case is whether the land involved is vacant school land; and this in turn depends upon the question of whether said land is located within the boundaries of the Theodore Slade survey, surveyed by Harper on November 19–20, 1846, on whose field notes it was patented in April, 1847.

The attached map shows the location of the Slade and its relation to the surrounding surveys. These surrounding surveys were run out from the San Jacinto river on the west and extended eastward, and were surveyed in 1838 and 1839. The Ransom House survey to the southeast of the Slade was surveyed in 1839 by Wade, and its northwest corner, indicated by the letter C on said map, established and marked by a bearing tree. All the surrounding surveys to

the west, south, and east of the Slade are senior surveys, and there seems to be no controversy but that they were actually surveyed on the ground and their lines and corners marked at the time, as well as the Lang League line to the east of the Slade. The Slade field notes on which it was patented called to begin at point A on said map, being the southeast corner of the Joseph House survey, in the north line of the Stewart, and to run as follows: "Thence North 75 East with said Stewart Survey 3000 varas to the West Boundary line of Ransom House's Remainder Survey. Set a Post from which a Red Oak 20 in. dia. mkd X bears S. 40 E. 9.7 varas distant. Thence N. 15 W. with said House's Survey 75 varas to the N. W. corner of same a Post from which a Pine 8 in. dia. mkd. H bears N. 27 W 2 varas dist. Thence N. 75 E. with said Survey 1100 varas to West prong of Crystal Creek course south 1275 varas to the point where the West Boundary line of Edward Lange's League (R. A. Chinn Assee.) crosses the North Boundary of said House's Survey." Thence north with the Lang League line on around closing on the established surveys on the west.

Since the surveys to the west, south, and east of the Slade had already been located, it is obvious that the complement of acreage in the Slade was to be made by extending same the necessary distance to the north from the Stewart and House surveys as the area to the north was then vacant public domain. And there seems to be no question but that the lines and corners of the Stewart and Ransom House surveys and the Lang League to which the Slade called to adjoin had been actually surveyed and established on the ground prior to the time the Slade was surveyed.

The present actual survey of the Slade by course and distance from its established and recognized southwest corner shows the following: If run, as called for in Harper's field notes, 3,000 varas N. 75 E. with the Stewart line, such corner falls 550 varas short of the Ransom House northwest corner; and if such course be continued along the Stewart line such excess distance, that is, 3,550 varas from the Slade beginning corner, instead of intersecting the House line S. 15 E. from the House northwest corner, it does not intersect the House west line at all, but would intersect an extension thereof at a point 75 varas N. 15 W. of the northwest corner of the House survey.

That is, in order to make the Slade close on the House northwest corner, as called for in said field notes, the first call of the Slade must run 3,550 varas instead of 3,000 varas, as called for in said field notes; and the second call, instead of running N. 15 W. 75 varas to said corner must be reversed to run S. 15 E. 75 varas to such corner. Harper's call from the northwest corner of the House along its north line is 1,275 varas to the Lang League line; whereas, the actual distance now disclosed on the ground between such points is 700 varas. It is likewise shown that the Crystal creek crossing called for by Harper on the north line of the House is erroneous, in that such creek is east of the Lang League line, instead of west thereof on the House north line. It is also true that in Harper's field notes of the Slade, made more than 7 years after the survey of the Ransom House by Wade, Harper called for the bearing tree marking the northwest corner of the House (an 8 inch pine) as the same size as called for by Wade 7 years before. There was evidence that pine trees in that area increased in diameter at the rate of about ½ inch per year.

From these facts and circumstances, it is the contention of the state that Harper did not find on the ground the lines and corners of the House called for by him, but merely called for them by conjecture and under the mistaken belief that the Ransom House survey was located some 550 varas west of where it actually was on the ground; that such mistaken calls should therefore be disregarded and the Slade laid out by course and distance from the established beginning corner. If this be done, the Slade survey would be pulled away from the Ransom House and the vacancy sued for thus created.

It may be doubted whether Harper in his survey of the Slade actually found and ran to the northwest corner of the House on the ground. If so, he was clearly mistaken as to the actual distance from his beginning corner to the House northwest corner; and likewise as to the distance between the northwest corner of the House and the Lang League line. The aggregate calls, however, from the Slade beginning corner to the Lang League line, that is, the east-west length of the Slade survey, correspond approximately with such distances as now actually found upon the ground. And the calls in the Harper field notes of the Slade for the upper or

northern corners and lines of the Slade strongly indicate that, as to those at least, Harper actually surveyed and located same on the ground.

■ The lines and corners called for by Harper in his field notes of the Slade are the best evidence of his intentions in the premises. These manifest, in our opinion, a clear intention to make the Slade adjoin the Stewart and Ransom House surveys. All maps in the state land office and all surveys shown in the record for a period of 85 years show and call for the Slade to adjoin the House. No question seems ever to have been raised as to such adjoinder until the discovery of oil beneath said lands. And whether Harper actually knew or found the exact location on the ground of the northwest corner of the House, or if it be admitted that he was mistaken as to such location at the time he made the survey of the Slade, such errors are not, in our opinion, controlling. Not only was the general location of the House survey undoubtedly known to him at the time, but its lines and northwest corner had actually been surveyed and marked on the ground, and its northwest corner marked by a bearing tree, thus being not only capable of definite ascertainment, but of actual location by marked bearings. As such the lines and northwest corner of the House attained the dignity of an artificial object, and the calls for adjoinder thereto should control over calls for course and distance, even admitting that Harper was mistaken as to such course and distance from his beginning corner. These facts and circumstances bring the instant case clearly within the rule announced by the Supreme Court in Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.(2d) 773, and by this court in Phillips Pet. Co. v. State, 63 S.W.(2d) 737, writ refused. See, also, cases therein cited.

■ And where it is the clear intention of the parties to make an adjoinder between a junior and senior survey and the course and distance call of the junior survey does not make such adjoinder, the adjoinder may be effected by running the line of the junior survey to a point where it intersects an extension of the line of the senior survey called for. McAninch v. Freeman, 69 Tex. 445, 447, 4 S.W. 369. And where such location shows a clear mistake of the surveyor as to course, such course may be reversed so as to effec-

tuate an adjoinder with an established line and corner. Warden v. Harris (Tex.Civ. App.) 47 S.W. 834.

■■ If Harper made the actual survey of the south line of the Slade on the ground the presumption is that he found the lines or corners called for, even though mistaken as to the distances. If he did not make such survey, but intended to make the adjoinders called for, and was mistaken as to their exact location, such marked lines and corner being definitely located and established on the ground, such calls for adjoinder will control over course and distance calls. Phillips Pet. Co. v. State, supra, and cases cited.

■ If, under the original survey of the Slade and the patent issued thereon, no vacancy existed between the Slade and the House surveys, the manner and method of describing the 15.77 acres involved in the pleadings or in the judgment becomes immaterial. Nor would the lines run in recent years by other surveyors in suits for partition of the Slade between joint owners, where the issues raised in this suit were not involved, control or fix the true location of the south boundary line of the Slade as fixed by the original survey, or the question of whether under such survey it adjoined the House survey.

■ Though he did not appeal from the judgment of the trial court, J. E. Franks has filed a brief herein asserting as fundamental error the action of the trial court in failing to dispose of his cross-action against the Humble and Sullivan and Hawkins; and as affirmative error the cancellation by the trial court of his lease from the state. If no vacancy existed as the trial court properly concluded, Franks had no valid lease from the State and the cancellation of his asserted lease could not have injured him. And his cross-action against his codefendants was dependent upon the existence of such vacancy and the validity of his lease thereon. The disposal of these two questions by the trial court in its judgment by necessary implication disposed of his cross-action also, whether the judgment so recited or not. Having properly denied to Franks the only basis he asserted for such cross-action filed by him, his cross-action necessarily falls and nothing remains for him to litigate with his codefendants. And if it be conceded that the trial

court erred in not expressly disposing of such cross-action, the error is harmless.

Finding no error in the record, the judgment of the trial court is affirmed.

Affirmed.

## On Motion for Rehearing.

In its motion for a rehearing the state complains, among other things, of the map attached to our opinion on the ground that it is incorrect, and, if approved by the court, would prejudice the rights of the state in another suit pending in the trial court, wherein the state is claiming a vacancy between the C. B. Stewart survey and the Ransom House survey, that is, south of the land here involved, and extending across the entire east end of the Stewart survey; the contention being that the map attached shows an adjoinder between the Stewart on the east and the Ransom House on the west, whereas, the field notes of the two surveys do not call for adjoinder, and the state is suing to recover as vacant lands a strip between them comprising about 180 acres.

It was not our intention to adopt the attached map as correct nor to approve it as a delineation of any adjoining surveys. Its insertion in the opinion was merely for the purpose of outlining the Slade survey and its general position with reference to other surveys in the vicinity, and for illustrative purposes only. The fact that numerous other surveys are shown, not here in controversy, makes that obvious. We did not intend to hold that the numerous lines shown on said map affecting other surveys are correctly located, and expressly decline to do so. Nor is such map to be considered as in any manner affecting the issue in any other suit pending as to whether vacancies exist between other surrounding surveys.

Appellant also complains that we were in error in holding that the surveys to the east were senior to the Slade. It is true that the Real survey was laid out subsequent to the survey of the Slade, but the Lang League line which constitutes the east boundary of the Slade, and the boundary with which we are here concerned, was senior to the Slade and had been established prior to the survey of the Slade.

In the respect above indicated, the appellant's motion is granted. In all other respects it is overruled.

Granted in part and in part overruled.